# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLEY D., <br><br> Plaintiff, <br><br> v. <br><br> UNITED HEALTHCARE INSURANCE COMPANY, <br><br> Defendant. | CASE NO. 15cv1012 JM(BLM) <br><br> STATEMENT OF DECISION PURSUANT TO FED.R.CIV.P. 52 |

## INTRODUCTION

On May 5, 2015, Plaintiff Kimberley D. commenced this Employee Retirement Income Security Act ("ERISA") action seeking damages for Defendant United Healthcare Insurance Company's ("UHIC") alleged breach of the LifeLock, Inc. Welfare Benefit Plan ("Plan"). Plaintiff broadly alleges that she has a 30-year history of mental illness consisting of major depressive disorder, generalized anxiety disorder, borderline personality disorder, and an eating disorder. When Plaintiff, a San Diego resident, self-referred to an Arizona residential treatment center, Sierra Tucson, for treatment of escalating depression and worsening eating disorder associated with life stressors, UHIC, through the mental health benefits administrator, United Behavioral Health ("UBH"), determined that inpatient treatment was not medically necessary as that term is defined in the Plan. Plaintiff alleges that the denial of the medically necessary treatment violated the Plan.

The parties agree that the de novo standard of review applies to Plaintiff's claims. The parties also agree to the contours of the evidentiary record submitted by the parties. Based upon the parties' submissions, the issue before the court is simply whether the inpatient residential treatment received by Plaintiff was medically necessary under the circumstances of this case and, therefore, a covered benefit under the Plan. Having carefully considered the matters presented, the court record, appropriate legal authorities, and the arguments of counsel, the court concludes that Plaintiff fails to show that UHIC breached the Plan.

## FINDINGS OF FACT

**Plaintiff's Medical History**

Plaintiff is a 51-year old woman with a history of mental illness and eating disorders. On April 22, 2013, Plaintiff was admitted to the Eating Disorder Center of San Diego ("EDCSD") and diagnosed with bulimia nervosa, and secondary diagnoses of major depressive disorder, recurrent, severe without psychotic features and posttraumatic stress disorder. (UBH 1441). The EDCSD report indicates the following symptoms: "binge eating daily; restricts all day, binges at night, gained 35 pounds since last October; using enemas and laxatives 2-3 times week; panic attacks; obsessing about food in house and hypervigilant." (UBH 1442). The report indicated that Plaintiff was not at imminent risk to herself or others. Id.

From April through August 2013, UBH authorized Plaintiff to receive 33 intensive outpatient sessions at out-of-network EDCSD to focus on her eating and related disorders. After discharge, Plaintiff underwent an additional 30 outpatient treatment sessions with focus on her eating and related disorders. Plaintiff received these treatments periodically through May 2014.

**Admission to Sierra Tucson**

On May 6, 2014, Plaintiff's husband called UBH and stated that a therapist suggested that Plaintiff receive inpatient treatment at Sierra Tucson. The cryptic notes from the telephone conversation indicate that the UBH representative informed

Plaintiff's husband that inpatient residential treatment was available upon showing medical necessity. The term medical necessity was explained to Plaintiff's husband. On May 8, 2014, Sierra Tucson called UBH to inquire about coverage and was informed that authorization was required for inpatient treatment.

On May 9, 2014, UBH called Plaintiff and inquired about her status and whether she needed assistance. The notes indicate that Plaintiff was not in crisis or at risk. Plaintiff reported that she was having difficulty coping with her home life and her eating order symptoms were "very hard to manage." Plaintiff also stated that her therapist recommended placement in Sierra Tucson, a residential inpatient facility, to treat her symptoms and mood/coping abilities. Plaintiff also informed the UBH representative about an "escalating home situation" involving her son and his girlfriend. The representative also suggested that Plaintiff consider a facility closer to her home in San Diego, California.

**The Initial Psychiatric Evaluation by Sierra Tucson**

On May 13, 2014, without authorization for residential treatment, Plaintiff admitted to Sierra Tucson for inpatient residential treatment where she received a psychiatric evaluation by Dr. Nia Sipp, a psychiatrist. The evaluation noted: CHIEF COMPLAINT: "...I was looking for treatment for my son's girlfriend and I thought maybe I could go to treatment myself..." (UBH 188). The HISTORY OF PRESENT ILLNESS section of the evaluation identifies that Plaintiff's eating disorder symptoms have increased with "life stressors." The "life stressors" consist of her then present living situation. Plaintiff's son and his girlfriend lived with Plaintiff as did her husband. She identifies that the girlfriend is "deliberately manipulative," mentally ill, and engages in damaging behavior. Both her son and the girlfriend are heroin addicts and her husband was in treatment for alcohol use disorder. The girlfriend injured herself and then falsely reported to the police that the son had injured her and threatened to also falsely tell the police that the entire family was involved with her injury. The husband moved out of the home to avoid the false allegations and Plaintiff

commenced a legal action against the girlfriend to effectuate her removal from the home. The HISTORY section concludes:

> Patient endorses depressive and anxious symptoms at this time along with SI (Suicide Ideation). Patient denies psychotic symptoms. She denies active SI and denies HI (Homicidal Ideation). Patient has no[] plan or intent to harm herself or harm others.

(UBH 0188).

Under the PSYCHIATRIC SYMPTOMS section, Dr. Sipp set forth the following evaluation:

> Depression: Pt. first experienced depressive symptoms as a child. She did not like school and often complained of somatic symptoms in an attempt to "disappear in school..." Pt. has had three severe depressive episodes as an adult in 2002, 2005 and 2012. She feels her current depressive episode is the most severe of the episodes. Her current depressive symptoms are characterized by hyper somnolence, low energy, anhedonia, carbohydrate cravings, feeling that her legs feel like " weights,,." , poor motivation, poor memory, low mood, feelings of worthlessness and hopelessness, recurrent wishes that she was someone else, passive and active suicidal ideation. Pt. has also had periods where she was unable maintain appropriate hygiene and grooming while depressed. Pt.'s passive and active SI during her treatment at EDCSD resulted in multiple safety assessments and welfare checks. Bipolar Spectrum symptoms: Denies.

Under the PSYCHIATRIC HISTORY section, the subheading identified as Suicide attempts, the evaluation indicates that, in "2002, patient lost 70 lbs and was severely depressed with increased suicidal ideation. Patient denies that she made a suicide attempt at that time." (UBH 189).

Under the MENTAL STATUS EXAM section, Dr. Sipp noted:

> This is a well-developed, well-nourished female in no acute distress. Pt, is tearful during evaluation. She is alert and oriented x 4, Her hygiene and grooming are intact. Her eye contact is well maintained. There are no psychomotor abnormalities observed. Her pace of speech, rhythm of speech and speech pattern are within normal limits. Her mood is anxious. Her affect is congruent with mood and full range. Her thought process is circumstantial and tangential. Her thought content is devoid of suicidal ideation or homicidal ideations. She denies current intent or plan to commit suicide or harm herself. She denies perceptual disturbances and there is no evidence of psychosis. Insight and judgment are fair and improving. Attention and concentration are intact. Cognition is grossly intact, but was not formally tested.

Dr. Sipp diagnosed Plaintiff with generalized anxiety disorder, major depressive

disorder recurrent severe, panic disorder, and borderline personality disorder. While Plaintiff argues that Sierra Tucson identified that Plaintiff had made an earlier suicide attempt at some unidentified point in time, (Opening Br. at p.5:22), the evaluation states that, at the time of admission, Plaintiff's "thought content is devoid of suicidal ideation or homicidal ideations. She denies current intent or plan to commit suicide or harm herself." (UBH 191).

**Suicide Risk and Suicide Ideation**

The medical records in this case contain references to suicide ideation (passive or active), suicide attempts, suicidality, suicidal thoughts, and suicide risk. Many of these reference seem to be invoked without definition, context, or explanation. Notwithstanding, this court is able to make some observations and findings regarding the general subject of suicide risk:

(1) At no time prior to her stay at Sierra Tucson, beginning in May 2015, is there any evidence Plaintiff ever attempted suicide.

(2) Although Plaintiff was initially evaluated at a "high" risk suicide level (at a 10-12 on a scale of 20), this initial risk level was not supported by either Plaintiff's chief complaint or history. Specifically Plaintiff presented with depression, worsening eating disorder and life stressors based upon her home environment. She denied active SI and was not planning to harm herself or others. Significantly, there is no explanation from Dr. Sipp as to why Plaintiff is "checked off" as a "high" suicide risk.

(3) Dr. Sipp, in her initial evaluation, for some unexplained reason noted Plaintiff had passive and active SI, notwithstanding her MENTAL STATUS EXAM assessment:

Her thought content is devoid of SI or homicidal ideations.
She denies current intent or plan to commit suicide or harm herself.

(4) In the "Plan" portion of Dr. Sipp's initial evaluation, there is no

mention of any issues or concerns related to suicide risk or ideation.

(5) There is no explanation in the record as to why Plaintiff was initially "checked off" as a "high" suicide risk and shortly thereafter "checked off" as a "low" risk (0-2 on a scale of 20).

(6) The observations and findings of Dr. Sipp with respect to Plaintiff's suicide risk level as "high" are unexplained, inconsistent, at odds with Plaintiff's history and presenting complaints, and unsupported by the weight of the medical records.

(7) It was only after UBH's initial denial of Plaintiff's appeal of UBH's determination that residential treatment was not medically necessary that Sierra Tucson informed UBH that Plaintiff was having suicidal thoughts and discussing stockpiling pills.

(8) Because Plaintiff's position that her stay at Sierra Tucson was medically necessary, due to her risk of suicide as diagnosed by Dr. Sipp, it is Plaintiff's burden to support that position by a preponderance of the evidence to prevail, something she fails to do.

**UBH's Initial Claim Decision**[1]

On May 14, 2014, UBH referred the claim file to its Associate Medical Director Jeffrey Uy to determine whether treatment at Sierra Tucson was "medically necessary" under the Plan. Dr. Uy reviewed Plaintiff's record and other clinical documentation, including the Sierra Tucson evaluation. Dr. Uy scheduled an appointment with Dr. Sipp to discuss Plaintiff's medical condition and treatment. Dr. Sipp did not call Dr. Uy. Dr. Uy attempted to reach Dr. Sipp on two different occasions but Dr. Sipp never returned the calls.

Upon review of the medical records, on May 19, 2014, Dr. Uy concluded that

---

[1] At oral argument, Plaintiff vehemently contended that the court may only consider the final decision of UBH to deny benefits in determining whether (and upon what basis) benefits were properly denied. The court finds it is not inappropriate to set out the entire claim history for relevant content.

Plaintiff did not satisfy the "medically necessary" requirement under the Plan and stated:

> [f]or admission to an Eating Disorders/Mental Health Residential Treatment Center from 5/13/2014 forward as per review of the clinical information provided your condition is reported to be essentially stable. You are not currently experiencing any acute medical complications. Your current mood symptoms are reported to be moderate in severity and your behavior has been well-controlled. You are described as cooperative and appropriate with others, compliant with treatment recommendations, and there have been no acting-out behaviors to suggest impulse control problems or risk of harm. It appears that you can maintain stability and continue to progress in your recovery with ongoing treatment in a less restrictive care setting; such as Mental Health and Chemical Dependence/ Substance Abuse Outpatient Services.

(UBH 89, 1494). Dr. Uy also explained that Sierra Tucson was an in-network provider and, therefore, Plaintiff could not be billed for fees beyond her copayment/deductible unless she signed a written explicit payment arrangement with Sierra Tucson.

**The First Appeal**

On or about May 19, 2014, Sierra Tucson requested an urgent appeal of the adverse claim decision. UBH assigned the appeal to Dr. Natasha Sane, a board-certified psychiatrist. Dr. Sipp conducted the appeal on behalf of Sierra Tucson and informed Dr. Sane of her opinion that Plaintiff required residential treatment due to the acuity of her current symptoms, specifically binge eating, depression, conflicts at home, and prior suicide attempt.[2]

By letter dated May 21, 2014, Dr. Sane denied the appeal and advised Plaintiff as follows:

> After talking with your doctor, it seems that though you may need help and support, you do not require the kind of structure, monitoring and clinical help provided in a mental health residential setting. You are reported to be medically stable and not at immediate danger to yourself or others. You may still have conflicts in family relationships, but these conflicts are not expected to resolve in this setting. You can continue to

---

[2] The court notes that Plaintiff cites UBH 302 for the proposition that Plaintiff had earlier made a suicide attempt. This document does not identify any previous suicide attempt. As noted above, Sierra Tucson's medical records indicate that, upon admission, while Plaintiff may have had suicidal thoughts, she did not present a danger to herself or others.

> work on healthy coping strategies and relationships with outpatient mental health providers, in collaboration with your medical physician and nutritionist. Long term residential care is not a benefit that is covered by your insurance plan. Based on our Level of Care Guideline for Mental Health Residential Level of Care, it is my determination that authorization can not [sic] be provided from 5/13/14 forward. Care could continue with outpatient providers.

(UBH 1497-98).

**The Second Appeal**

On May 22, 2014, Sierra Tucson informed UBH for the first time that Plaintiff was having suicidal thoughts. Plaintiff stated that "she has multiple medications stockpiled at home, and plans to go home, get her meds, and check into a hotel and take everything or drive into something causing accident." (UBH 1502). On May 21, 2014, Dr. Sipp noted in her progress notes that Plaintiff "clearly voiced that she will kill herself if she has to go home. Patient does not have adequate support or structure in the home to prevent suicide attempt or to provide increased safety. Primary stressors are within the home." (UBH 296). During this time, Plaintiff was monitored at Sierra Tucson to prevent binge eating and her medications were adjusted (Klonopin, Effexor, Prozac, Lamictal, Wellbutrin, and Metaformi).

UBH referred Plaintiff's file to reviewing physician Dr. Diana Antonacci, M.D. for further review. On May 22, 2014, Dr. Antonacci determined that while "[t]he facility reports that the patient is imminently dangerous to herself due to her mood symptoms and her suicidal ideation[,]" it was her opinion that

> based upon the information provided, this case does not meet medical necessity criteria for mental health residential level of care. This patient requires an emergency assessment regarding her suicidal ideation and risk of harm to self. She may then require a higher level of care, such as mental health inpatient level of care.[3]

(Id. at 1517). UBH then referred Plaintiff's file to Dr. Randall Solomon, M.D., a

---

[3] At oral argument, it was established that mental health inpatient care (or the alternative of acute hospital evaluation) is appropriate when the psychiatrist determines that the patient is unstable or where suicidality is high. Essentially, it is the highest level of acute care addressing serious risk of suicide. It ranks higher that non-intensive outpatient care, intensive outpatient care, partial hospitalization, and inpatient residential treatment, in that order.

board-certified psychiatrist. After review of Plaintiff's file, on May 23, 2014, Dr. Solomon denied the request for impatient residential care noting:

> This case does not meet medical necessity criteria for mental health residential level of care. This patient requires an emergency assessment regarding her suicidal ideation and risk of harm to self. She may then require a higher level of care, such as mental health inpatient level of care. . . This determination does not mean that you do not require additional health care, or that you need to be discharged.

(UBH0084; UBH1518). Plaintiff was once again informed that Sierra Tucson could not bill Plaintiff for any residential treatment beyond the copay and deductible amounts. Plaintiff did not seek an emergency assessment with an outside provider to determine the suicide risk, if any (as required by the terms of the Plan).

**The Third Appeal**

On May 28, 2014, Sierra Tucson requested an expedited appeal. (UBH1519). UBH referred the matter to Dr. Svetlana Libus, a board-certified psychiatrist, for further review. Dr. Sipp informed Dr. Libus of Plaintiff's suicide ideation and failure to thrive after one year of intensive outpatient therapy for her eating disorders. After review of the clinical records, Dr. Libus concluded that Plaintiff "required the kind of structure, monitoring and clinical help provided in a mental health inpatient setting and not a residential setting." (UBH 1520. On May 28, 2014, UBH denied the expedited appeal.

**Plaintiff's Continued Treatment and Discharge**

Despite the denial of benefits, Plaintiff remained at Sierra Tucson. On May 28, 2014, the medical records that Plaintiff still had suicidal thoughts. On June 3, 2014, Plaintiff suffered a fever and vomiting. On June 4, 2014 Plaintiff was sent to the emergency room for asceptic meningitis, and admitted for three days after which she returned to Sierra Tucson. On June 27, 2014, Plaintiff discharged from Sierra Tucson. The Medical Discharge Summary identified four levels of risk for suicide. Plaintiff was listed in the lowest risk category.

**The Post-Service Appeal**

On July 18, 2014, Plaintiff, through counsel, filed a final appeal and enclosed

Sierra Tucson's medical records to substantiate her claims. The records did not include a signed contract whereby Plaintiff agreed to fully compensate Sierra Tucson for its charges. By letter dated August 8, 2014, UBH informed Plaintiff that she had no financial obligation to Sierra Tucson "beyond any applicable deductible and copayment," an amount considerable less than the amount Plaintiff paid for treatment ($38,999.89). In light of the fact that Sierra Tucson could not collect more than the copayments under the Plan, the letter also indicated that "it is not the responsibility of [Plaintiff] to appeal [the denial of coverage]." On or about September 15, 2014, Plaintiff's husband signed a personal guarantee for the total cost of the treatment, apparently on advice of counsel. (UBH 750).

On October 6, 2014, UBH referred Plaintiff's file to Dr. Thomas Blocher, M.D., who is board-certified in psychiatry and addiction medication. Upon review of the records, Dr. Blocher concluded that Plaintiff could have continued her treatment in an intensive outpatient setting. On October 16, 2014, UBH denied the claim. Dr. Blocher noted:

> You are not in a danger to yourself or others. . . The suicidal ideation that is documented by the MD is in relationship to going home with life unchanged, not while in treatment. . . . You were not a danger to yourself or others. Your medications are stable and had been helpful. You were cooperating with your doctors, and your behavior was under good control. The doctor did not need to see you frequently. You did not require 24 hour nursing care. The suicidal ideation that is documented by the MD is in relationship to going home with life unchanged, not while in treatment. . .

(UBH 64).

**The Plan**

The Plan provides benefits only for health services that are "medically necessary." (UBH 1062). The Plan defines "medically necessary" as:

> health care services provided for the purpose of preventing, evaluating, diagnosing or treating a Sickness, Injury, Mental Illness, substance use disorder, condition, disease or its symptoms, that are all of the following as determined by us or our designee ...:
>
> • In accordance with Generally Accepted Standards of Medical Practice.
>
> • Clinically appropriate, in terms of type, frequency, extent, site and

duration, and considered effective for your Sickness, Injury, Mental Illness, substance use disorder, disease or its symptoms.

• Not mainly for your convenience or that of your doctor or other health care provider.

• Not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your Sickness, Injury, disease or symptoms.

(UBH 1117).

"Generally Accepted Standards of Medical Practice" are "standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, relying primarily on controlled clinical trials, or, if not available, observational studies from more than one institution that suggest a causal relationship between the service or treatment and health outcomes." (Id.). UHIC "develop[s] and maintain[s] clinical policies that describe the Generally Accepted Standards of Medical Practice scientific evidence, prevailing medical standards and clinical guidelines supporting our determinations regarding specific services." (UBH 1118). "If no credible scientific evidence is available, then standards that are based on Physician specialty society recommendations or professional standards of care may be considered."  The Plan imbues UBH with "the right to consult expert opinion in determining whether health care services are Medically Necessary." (UBH 1117).

"Covered Health Services" under the Plan include the diagnosis and treatment of medically necessary Mental Illnesses, i.e. "those mental health or psychiatric diagnostic categories that are listed in the current Diagnostic and Statistical Manual of the American Psychiatric Association ("APA"), unless those services are specifically excluded under the Policy."  (UBH 1062).

## STANDARD OF REVIEW

Under the de novo standard of review, this Court gives no deference to United's claim decisions. Rather, this Court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits without reference to whether the

administrator operated under a conflict of interest." Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006). Because UBH's final determination was that residential was not medically necessary for Plaintiff, the court's analysis is limited to that reason. Harlick v. Blue Shield of California, 686 F.3d 699, 719-20 (9th Cir. 2012). Plaintiff has the burden to show that her treatment at Sierra Tucson was medically necessary. See Muniz v. Amec. Constr. Mgmt., Inc., 623 F3d 1290, 1294 (9th Cir. 2010).

## DISCUSSION

Plaintiff argues that she satisfied the criteria for the highest level of care under applicable APA guidelines by showing (1) she "needed the structure and monitoring provided in residential treatment to maintain her safety from suicide and binge and restrict behaviors;" (2) she "had co-occurring behavioral health and medical conditions which could be safely managed in residential treatment;" (3) the so-called "why now" factors support her claim: Plaintiff's "son and his girlfriend were heroin addicts who lived in Kimberley's home, associated criminal charges against her son and his incarceration, her husband moving out of the home due to the chaotic living situation, and Kimberley's inability to improve in intensive outpatient treatment while living at home;" and (4) she had an "'acute impairment of behavior that interfered with her activities of daily living to the extent that her welfare was endangered (i.e. constant urges to binge, 100% of her time thinking about her weight, and restricting for days)." Plaintiff also identified that she had a GAF score of 35-40 (out of a scale of 100), indicating impairment in such areas as family relations, school, poor judgment, and depressed mood. Further, she suffered "environmental problems" at home (i.e. living with her heroin-addicted son and what Plaintiff describes as his mentally ill girlfriend. (Opening Br. at pp. 18:14 - 19:6).[4]

---

[4] The court noted above that the Plan adopted the Generally Accepted Standards of Medical Practice to determine whether a treatment is medically necessary. Plaintiff argues that she applied UBH's 2014 Level of Care Guidelines for Residential Treatment to her condition. However, Plaintiff does not identify how the two

The court concludes that Plaintiff fails to meet her burden to show that inpatient residential treatment was medically necessary. First, scant evidence supports Plaintiffs claim that residential treatment was required to provide structure and monitoring to prevent her from suicide and binge eating; necessary to treat her depressive disorder and generalized anxiety disorder; and necessary to control her urges to binge eat, think about her weight, and restricting. The "why now" factors leading to treatment involve Plaintiff's son and mentally ill girlfriend, both heroin addicts, criminal charges being brought against her son, and her husband abandoning the home.

Second, substantial evidence exists to show that inpatient treatment was not medically necessary. The record shows that Plaintiff was medically stable throughout the relevant time frame (except when she was admitted to the emergency room for a few days in June 2014 with asceptic meningitis), and her medical history indicates that she has received treatment for eating and related disorders for over 20 years. She self-reported that her "primary problems" are binge earing, isolation, and poor body image. Plaintiff also received effective treatment from June through September 2013 from EDCSD.

While the record shows that Plaintiff suffered from suicide ideation in 1997 and 2002, Plaintiff denied ever making a suicide attempt and denied suicide ideation when she admitted to Sierra Tucson on May 13, 2014. The psychiatric evaluation emphasizes Plaintiff's eating disorder and the stress caused by her home life. The evaluation reveals that Plaintiff did not clearly express suicide ideation at that time. During the period of May 19 through May 25, 2014, the nursing notes show that Plaintiff repeatedly and consistently denied suicide ideation. (UBH 390, 395, 397, 392). Upon learning about the denial of her request for inpatient residential treatment, Plaintiff claimed active suicidal thoughts for the first time.

Finally, looking to the APA, Plaintiff fails to carry her burden. While the first, third, fourth, and sixth criteria are satisfied, other criteria are not satisfied. The second

---

guidelines differ.

criterion requires a showing that the "member's current condition cannot be safely efficiently and effectively assessed and/or treated in a less intensive setting." The record shows that Plaintiff received effective treatments for her eating and related disorders from EDCSD for the April through August 2013 time frame. The second criterion requires the treatment to be clinically appropriate for the member's condition. Although Sierra Tucson recommended residential treatment for Plaintiff's eating related disorders, there is no showing that intensive outpatient treatment has been or would have been any less effective in providing Plaintiff with clinically appropriate treatment.

## SUMMARY

In sum, this is a sad case. The record demonstrates that when Plaintiff "self-admitted" at Sierra Tucson it was because of depression and stress associated with a dysfunctional family living environment and a worsening eating disorder. Suicidal ideation was neither a reason motivating Plaintiff nor an evidentiary supported diagnosis for the initial assessment. Only after UBH initially determined residential treatment was not medically necessary did Plaintiff express suicidal thoughts and mention the stockpiling of pills. A truly high risk of suicide would have demonstrated mental instability and placement in an intensive inpatient facility or acute hospital for evaluation, as suggested by the many board-certified psychiatrists hearing Plaintiff's appeals. Sierra Tucson never referred or transferred Plaintiff to such a facility. Finally, the weight of the evidence does not support the proposition that either Plaintiff's eating disorder, or life stressors, individually or in combination, necessitated residential treatment. Rather, the alternatives outlined by UBH in its final determination complied with Plan requirements and Plaintiff's needs

For the foregoing reasons, the court finds UBH properly denied Plaintiff's request for reimbursement for residential treatment at Sierra Tucson. Specifically, the medical record and evidence before the court fail to establish, by a preponderance of the evidence, that the residential treatment received by Plaintiff at Sierra Tucson in

1  May - June 2015 was medically necessary within the meaning of the Plan.
2      Judgment is awarded in favor of UBH, and against Plaintiff. The court will
3  prepare a separate judgment.
4      **IT IS SO ORDERED.**
5  DATED: August 1, 2016
6  
7  cc:    All parties

**JEFFREY T. MILLER**
United States District Judge